# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| v. | § | MO:24-CR-00162-DC |
| BUDDY FLOYD GARMON | § | |

## ORDER DENYING MOTION TO DISMISS INDICTMENT

If it feels like we've been here before, it's because we have—repeatedly. Following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,[1] a barrage of defendants have challenged their gun-related convictions. Each comes armed with like ammunition, insisting that 18 U.S.C. § 922(g)(1) violates the Second Amendment.

Enter Defendant Buddy Garmon, a convicted felon who seeks to have dismissed his indictment for unlawful possession of a firearm. Garmon claims the indictment violates the Commerce Clause, is facially unconstitutional, and is unconstitutional as applied to him.[2] Yet he admits—rightly so—that virtually all legal ammunition has been spent.[3] What remains hanging by a thread is his as-applied challenge.

Garmon's as-applied arguments ricochet off the backstops of *hundreds* of cases before him where courts, this one included, have denied similar requests. His challenge rests on the argument that no historical analogues exist for disarming dangerous felons like Garmon,

---

[1] 597 U.S. 1 (2022).
[2] Garmon also throws a Hail Mary by claiming the indictment is insufficient as it fails to state the specific felony offense on which the felon-in-possession charge is predicated. The Court is unpersuaded.
[3] Motion, at 2 (admitting knowledge that his facial challenge is "foreclosed" by *Diaz* and that his Commerce Clause challenge is "foreclosed" by *United States v. Rawls*, 85 F.3d 240, 242 (5th Cir. 1996)).

1

who have a history of robbing and assaulting those around them. But at least one of Garmon's predicate felonies—robbery—has clear historical analogues. This Court needs only one such analogue to uphold Garmon's indictment.

Thus, having carefully considered convicted felon, Garmon's Motion to Dismiss Indictment (the "Motion"),[4] the Court **DENIES** the Motion in full.

## I.     BACKGROUND/PROCEDURAL HISTORY

In July of this year, Garmon was arrested and charged with unlawful possession of a firearm, in violation of § 922(g)(1). Officers connected Garmon to a local burglary where an unidentified individual stole several firearms. Officers learned of the burglary after investigating reports of firearms found in several odd locations, including behind a dumpster and a gas station. Through methods not disclosed to the Court, Midland Police officers identified Garmon as a suspect. Police located and approached Garmon at a local gas station and Garmon volunteered that he was in possession of methamphetamine.[5] Officers detained Garmon, transporting him to the Midland Police Department for questioning on the burglary. Garmon waived his *Miranda* rights and admitted to the burglary, providing officers with the location of additional stolen weapons.

This was not Garmon's first brush with the law. His criminal history boasts felony convictions for unauthorized use of a motor vehicle, for which he was sentenced to ten years confinement, robbery for twenty, *another* unauthorized use of a motor vehicle for five, aggravated assault with a deadly weapon for three, and aiding and abetting distribution of cocaine within 1,000 feet of a school for 21 months. Because of these convictions, the

---

[4] Doc. 26.

[5] The outcome of the methamphetamine charge is irrelevant to this opinion.

Government indicted Garmon for possession of a firearm following a felony conviction in violation of § 922(g)(1).[6]

Several months after being indicted, Garmon filed the Motion asking this Court to dismiss the indictment. Despite having filed this Motion, Garmon pleaded guilty to the indictment just weeks later.

Garmon's Motion does not dispute the conduct underlying his plea but instead asserts that the indictment is unconstitutional both facially and as applied to him. He further argues that § 922(g)(1) is unconstitutional because it violates the Commerce Clause, and the indictment, as drafted, is insufficient as it fails to state the specific felony offense on which the felon-in-possession charge is predicated.[7] For reasons discussed in detail below, the Court finds these arguments unpersuasive.

## II. STANDARD

Federal Rule of Criminal Procedure 12 allows a party to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits."[8] Specifically, the rule allows a defendant to file a pretrial motion to dismiss an indictment on the ground that there is "a defect in the indictment," such as the "failure to state an offense."[9] A court may rule on a pretrial motion to dismiss an indictment where, as here, the motion presents a question of law involving undisputed facts.[10]

## III. SECOND AMENDMENT JURISPRUDENCE

---

[6] United States' Response to Defendant's Motion to Dismiss ("Response"), at 1.
[7] Response, at 26-27.
[8] Fed. R. Crim. P. 12(b)(1).
[9] *Id.* 12(b)(3)(B)(v); *United States v. Vasquez*, 899 F.3d 363, 371 (5th Cir. 2018).
[10] *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005).

Before considering the arguments, it is necessary to understand the "still-developing area" of Second Amendment jurisprudence, a field "still in the relatively early innings."[11]

The Second Amendment mandates that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[12] Interpreting this language in the landmark case *District of Columbia v. Heller*, the Supreme Court recognized that the Second Amendment "protect[s] an individual right to keep and bear arms for self-defense."[13] But "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and "nothing . . . should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," which are "presumptively lawful."[14]

Following *Heller*, courts across the country, including the Fifth Circuit, adopted a two-part test for analyzing laws that might impact the Second Amendment.[15] Under this inquiry, courts first asked whether the challenged law impinged upon a right protected by the Second Amendment.[16] If it did, courts proceeded to the second step, at which point they determined whether to apply intermediate or strict scrutiny and then applied that requisite

---

[11] *United States v. Rahimi*, 144 S. Ct. 1889, 1923 (2024) (Kavanaugh, J., concurring).
[12] U.S. CONST. amend. II.
[13] *Bruen*, 597 U.S. at 17 (citing *Heller*, 554 U.S. at 595 (internal quotation omitted)).
[14] *Heller*, 554 U.S. at 626-27 n.26.
[15] *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016), *abrogated by Diaz*, 116 F.4th at 458.
[16] *Id.* (citing *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012)).

level of scrutiny to the challenged law.[17] Under this two-part test, the Fifth Circuit (and others) have repeatedly upheld the constitutionality of § 922(g)(1).[18]

Just two years ago, the Supreme Court refined *Heller* in *Bruen*. There, the Court "extended *Heller*'s protection for carrying handguns in the home to carrying them publicly."[19] In so doing, "the Court rejected the second step of the two-step framework that had developed after *Heller*."[20] As a result, only the first step—considering whether the challenged law infringes on Second Amendment rights—remains.

This new inquiry dictates that once step one is established, the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."[21] The government must detail "*how and why* the regulations burden a law-abiding citizen's right to self-defense."[22] Because the question of whether a law infringes on one's Second Amendment rights is rarely at issue, "the 'two-step' view of *Bruen* is effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation."[23]

Applying the new *Bruen* framework in *Rahimi*, the Fifth Circuit found § 922(g)(8)—a statutory provision restricting firearm possession by individuals convicted of misdemeanor

---

[17] *Id.*
[18] *See, e.g., Hollis*, 829 F.3d at 446 (upholding § 922(g)(1) under two-part inquiry); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010) (same); *United States v. Staten*, 666 F.3d 154, 158 (4th Cir. 2011) (same).
[19] *United States v. Diaz*, 116 F.4th 458, 463 (5th Cir. 2024) (citing *Heller*, 597 U.S. at 8-9).
[20] *Id.* (citing *Heller*, 597 U.S. at 19) ("Despite the popularity of this two-step approach, it is one step too many.").
[21] *Id.* at 465 (citing *Heller*, 597 U.S. at 17).
[22] *Bruen*, 597 U.S. at 29.
[23] *Id.* (citing *Rahimi*, 144 S. Ct. at 1898).

5

domestic violence—facially unconstitutional.[24] In evaluating the statute, the Fifth Circuit found no sufficiently similar historical analogues, *i.e.*, that the law was inconsistent with American history and tradition.[25]

On review at the Supreme Court, an eight-Justice majority reversed, holding that § 922(g)(8) " 'fits comfortably' in this Nation's tradition of 'preventing individuals who threaten physical harm to others from misusing firearms.' "[26] The Court, however, reiterated that "a 'historical *twin*' is not required."[27] Even when a challenged regulation does not precisely mirror its historical precursors, "it still may be analogous enough to pass constitutional muster."[28]

The *Rahimi* Court located its first analogue in surety laws—laws used to " 'prevent all forms of violence, including spousal abuse' and the misuse of firearms."[29] Additional support existed in "going armed" laws, which prohibited "riding or going armed, with dangerous or unusual weapons, to terrify the good people of the land."[30] Because such conduct "disrupted the public order and led almost necessarily to actual violence . . . the law punished these acts with forfeiture of the arms and imprisonment."[31]

Examining the "why and how," the *Rahimi* Court clarified that both surety and going armed laws burdened the Second Amendment and that, "just like § 922(g)(8), both surety

---

[24] 61 F.4th 443, 450–51 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1889 (2024).
[25] *Id.* at 456.
[26] *Id.* at 464 (citing *Rahimi*, 144 S. Ct. at 1897).
[27] *Rahimi*, 144 S. Ct. at 1903 (quoting *Bruen*, 597 U.S. at 30).
[28] *Id.* (quoting *Bruen*, 597 U.S. at 30).
[29] *Diaz*, 116 F.4th at 464 (citing *Rahimi*, 144 S. Ct. at 1900).
[30] *Id.* (citing *Rahimi*, 144 S. Ct. at 1901(internal citation omitted)).
[31] *Rahimi*, 144 S. Ct. at 1901 (internal citation omitted) (cleaned up).

and going armed laws were used 'to mitigate demonstrated threats of physical violence.' "[32] In other words, § 922(g)(8)'s burden was "comparable to the burdens imposed by surety and going armed laws."[33] Additionally, violations of surety and going armed laws often led to imprisonment.[34] If imprisonment was permissible in response to the use of guns to threaten others' physical safety, reasoned the Court, then the lesser restriction of temporary disarmament imposed by § 922(g)(8) is also permissible.[35]

In conclusion, the *Rahimi* Court held that § 922(g)(8) does not violate the Second Amendment, facially or as applied to Rahimi, because "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others."[36]

Most recently, the Fifth Circuit issued its opinion in *Diaz*, denying both a facial and as applied challenge to the constitutionality of § 922(g)(1) and finding historical analogues warranting Diaz's disarmament. In so holding, the court explained that the Second Amendment applies to *all* individuals—even felons—and thus that § 922(g)(1) fell within the scope of the Second Amendment—satisfying *Bruen*'s first step.[37] The court devoted the bulk of its analysis to *Bruen*'s second step—determining whether § 922(g)(1)'s regulation of firearm use, in this way, is "consistent with the Nation's historical tradition."

---

[32] *Id.*
[33] *Diaz*, 116 F.4th at 464 (citing *Rahimi*, 144 S. Ct. at 1901-2 (internal citation omitted)).
[34] *Id.* (citing *Rahimi*, 144 S. Ct. at 1902 (internal citation omitted)).
[35] *Id.* (citing *Rahimi*, 144 S. Ct. at 1902 (internal citation omitted)).
[36] *Id.* (citing *Rahimi*, 144 S. Ct. at 1902).
[37] *Diaz*, 116 F.4th at 466 (citing *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting) ("[A]ll people have the right to keep and bear arms," but "history and tradition support Congress's power to strip certain groups of that right.")).

Applying *Bruen* and *Rahimi*, the court considered theft laws as analogues to the crime of vehicle theft, of which Diaz was convicted. These theft laws were considered felonies at the Founding.[38]

In considering the "how," it noted that theft crimes were generally punished by death penalty or estate forfeiture—severe, permanent punishments, generally considered to be felony punishments by legal scholars and historians.[39] Section 922(g)(1) also imposes severe, permanent punishment, although of arguably lesser severity through permanent disarmament.[40] Thus, following the logic of *Rahimi*,[41] if capital punishment was a permissible punishment for theft, "then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible."[42]

In considering the "why," the Fifth Circuit explained that "these laws were 'justified by the need to adequately punish felons, deter reoffending, and protect society from those proven untrustworthy to follow the law.'"[43] The court observed a similar justification for § 922(g)(1).[44]

Concluding, the *Diaz* court emphasized that its holding was "not only premised on the fact that Diaz is a felon" as "[s]imply classifying a crime as a felony does not meet the

---

[38] *Id.* at 468-69.
[39] *Id.* at 467.
[40] *Id.* at 469 (citing *Rahimi*, 144 S. Ct. at 1898).
[41] In *Rahimi*, the Supreme Court found the lesser punishment of temporary disarmament under § 922(g)(8) acceptable because the historical analogue allowed for imprisonment. *Id.* at 1902.
[42] *Diaz*, 116 F.4th at 469 (discussing *Rahimi*, 144 S. Ct. at 1902).
[43] *Id.*
[44] *Id.*

level of historical rigor required by *Bruen* and its progeny."[45] The conviction was upheld was because Diaz's theft conviction matched a Founding-era analogue and that analogue imposed a punishment at least as severe as disarmament.

## IV. ANALYSIS

Garmon argues that § 922(g)(1) is unconstitutional both facially and as applied to him. Garmon's as-applied challenge posits that no historical analogues exist that satisfy *Bruen* or *Diaz*.[46] The Government's response includes several such analogues. The Court also identified, in under fifteen minutes, several analogues of its own. The Court analyzes Garmon's as-applied and facial arguments in turn, beginning with his as-applied challenge because it is the "narrower consideration."[47]

### A. As Applied Challenge

Because "[t]he plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1),"[48] the core issue in an as-applied challenge is whether a sufficiently similar Founding-era analogue exists for the underlying conviction. Any analogue must exhibit similarity both as to the *type* and *purpose* of the punishment,[49] although it need not be a "dead ringer."[50] In determining similarity, this Court considers "whether modern and historical

---

[45] *Id.*
[46] Motion, at 2.
[47] *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019).
[48] *Diaz*, 116 F.4th at 467.
[49] *Bruen*, 597 U.S. at 29 (courts must consider "how and why the regulations burden a law-abiding citizen's right to armed self-defense").
[50] *Id.* at 24, 29.

regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified."[51]

Garmon's relevant predicate convictions under § 922(g)(1) are those "punishable by imprisonment for a term exceeding one year"[52]—*i.e.*, felonies. Garmon's pertinent criminal history includes robbery, aggravated assault with a deadly weapon, unauthorized use of a motor vehicle, and aiding and abetting distribution of cocaine within 1000 feet of a school.[53]

Of particular significance are the convictions for aggravated assault and robbery—convictions that decidedly render Garmon a *dangerous* felon, at least by modern standards. Courts post-*Bruen* have stressed this dangerousness element in analyzing as-applied challenges to § 922(g)(1),[54] highlighting that " 'dangerousness' of some form has long been considered sufficient ground for depriving a person of their right to keep and bear arms."[55] This thinking was echoed in *Rahimi*, where the Court accepted the idea that "the Second Amendment permits the disarmament of individuals who pose a credible threat to the

---

[51] *Id.*
[52] *See* 18 U.S.C. § 922(g)(1).
[53] Response, at 1.
[54] *See, e.g., United States v. DeLeon*, No. EP-22-CR-01580-DCG (1), 2024 WL 2066528, at *15-17 (W.D. Tex. May 6, 2024), *overruled in part by Diaz*, 116 F.4th at 467 (considering dangerousness of felonies in section 922(g)(1) challenge); *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) (America's "history and tradition demonstrate that Congress may disarm individuals they believe are dangerous"); *United States v. Barwicks*, No. 20-CR-00563, 2024 WL 1521473, at *11 (N.D. Ill. Apr. 8, 2024) (finding evidence "that the colonies disarmed dangerous people").
[55] *United States v. Small*, No. CR 16-381-1, 2024 WL 4041752, at *4 (E.D. Pa. Sept. 4, 2024) (collecting Founding-era laws allowing seizure of arms and/or other weapons of dangerous individuals or those that disrupt the peace).

physical safety of others,"[56] at least after a judicial finding of such a threat. Such a judicial finding exists here—as Garmon has been convicted of multiple violent felonies.

One of those felonies, robbery, has long been considered a dangerous crime[57]—one generally punished by disarmament, or worse. This Court's own research revealed several Founding-era laws either explicitly classifying robbery as a felony or treating it as such.[58] For example, a 1788 New York law classified robbery as a felony punishable by death *and* estate forfeiture.[59] A similar law existed in Pennsylvania.[60]

Additionally, the Government identified several other laws, including "going armed" laws[61] and theft laws,[62] that imposed punishments either equal to or exceeding in severity that imposed by § 922(g)(1).

---

[56] *Rahimi*, 144 S. Ct. at 1898.
[57] *See, e.g.,* CHARLES VAN COURT, THE PREVENTION AND CONTROL OF ROBBERY, VOL. 5: THE HISTORY AND CONCEPT OF ROBBERY 9 (discussing robbery's early and continued existence as an "especially dangerous" crime); An Act for the Punishment of Certain Crimes Against the United States, ch.IX, (1790), available at https://www.loc.gov/resource/rbpe.21301400/?sp=5&st=pdf&pdfPage=2 (punishing robbery and piracy, and the aiding of such, on the high seas, with death); Act of Feb. 21, 1788, ch.37, 1788 N.Y. LAWS 666 (classifying robbery as a felony punishable by death or estate forfeiture).
[58] *See, e.g.,* Act of Feb. 21, 1788, ch.37, 1788 N.Y. LAWS 666 (classifying robbery as a felony punishable by death and estate forfeiture); VAN COURT, *supra* note 57 (discussing robbery's early and continued existence as an "especially dangerous" crime).
[59] Act of Feb. 21, 1788, ch.37, 1788 N.Y. LAWS 666 (every person convicted of ". . . robbery or other felony . . . shall [be] . . . liable to suffer death, shall forfeit to the People of this State, all his, or her goods and chattels, and also all such lands, tenements, and hereditaments . . ."); Act of Apr. 5, 1790, § 2 (1790), 13 *The Statutes at Large of Pennsylvania* 511, 511–12 (Wm. Stanley Ray ed., 1908) (1786 law punishing robbery with estate forfeiture and imprisonment).
[60] Act of Apr. 5, 1790, § 2 (1790), 13 *The Statutes at Large of Pennsylvania* 511, 511–12 (Wm. Stanley Ray ed., 1908) (punishing robbery with estate forfeiture).
[61] Going armed laws are relevant to Garmon's robbery conviction because of robbery's early and continued existence as an "especially dangerous" crime. VAN COURT, *supra* note 57.
[62] Although theft and robbery are obviously distinct crimes, the Government argues persuasively that theft laws serve as analogues because robbery encompasses a theft, as well

11

Having now identified several potential analogues, the Court turns to *Bruen*'s two "central considerations"—ensuring the *why* and *how* of these analogues match those of today.

As to the "why," the proffered analogues were necessary to deter offenders, protect the public, and punish those who threatened it, just like § 922(g)(1). Going armed laws, laws punishing thievery, and those punishing robbery were *all* driven by deterrence, punishment, and societal preservation.[63] As an example, the Fifth Circuit in *Diaz* found that "theft laws were 'justified by the need to adequately punish felons, deter reoffending, and protect society from those proven untrustworthy to follow the law.' "[64] Going armed laws were used "to mitigate demonstrated threats of physical violence."[65] Similarly, the precursor to § 922(g)(1)'s stated purpose was "to keep firearms out of the hands of those who are 'a hazard to law-abiding citizens' and who had demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.' "[66] Comparing these purposes, it is clear that the "why" of the analogues align with the "why" of § 922(g)(1)—deterring lawlessness and violence.[67]

As to the "how," the proffered analogues achieved their ends by permanently punishing offenders—again, just like § 922(g)(1). These analogues imposed severe,

---

as a threat of death or imminent bodily injury while committing said theft. Response, at 4 (citing Tex. Penal Code Ann. § 29.02 (West)).
[63] *See, e.g., Rahimi*, 144 S. Ct. at 1901 ("going armed" laws were used "to mitigate demonstrated threats of physical violence"); *Diaz*, 116 F.4th at 469 (theft laws were "justified by the need to adequately punish felons, deter reoffending, and protect society from those proven untrustworthy to follow the law").
[64] *Diaz*, 116 F.4th at 469.
[65] *Id.*
[66] *Id.* (quoting 114 CONG. REC. 14773 (daily ed. May 23, 1968) (statement of Sen. Russell Long of Louisiana).
[67] *See id.* ("Addressing *Bruen*'s two 'central considerations,' the 'why' of these examples aligns with the 'why' of § 922(g)(1).").

permanent penalties ranging from disarmament to death or estate forfeiture. Thievery, as discussed in *Diaz*, was met with *both* death and forfeiture.[68] Robbery invited similar penalties.[69] And though less severe in punishment than theft or robbery, going armed laws mandated imprisonment, meaning effective forfeiture of weapons.[70] Given that these analogues mandated such harsh, permanent punishments, Garmon's disarmament does not punish "to an extent beyond what was done at the founding."[71]

In conclusion, these analogues "establish that our country has a historical tradition of severely punishing people like [Garmon] who have been convicted of [violent, felonious crimes like robbery]."[72]

### B. Facial Challenge

To sustain a facial challenge, "the challenger must establish that no set of circumstances exists under which the statute would be valid."[73] Aside from the fact that no circuit court, including the Fifth Circuit, has held § 922(g)(1) facially unconstitutional post-*Bruen*,[74] Garmon cannot establish a facial challenge because "the statute is constitutional as applied to the facts of his own case."[75]

---

[68] Response, at 10 (citing *Diaz*, 116 F.4th at 469).
[69] *See, e.g.,* Act of Feb. 21, 1788, ch.37, 1788 N.Y. LAWS 666 (classifying robbery as a felony punishable by death or estate forfeiture).
[70] Response, at 6 (quoting *Rahimi*, 144 S. Ct. at 1901).
[71] *Diaz*, 116 F.4th at 469 (quoting *Rahimi*, 144 S. Ct. at 1898).
[72] *See id.*
[73] *Id.* at *9 (quoting *Salerno*, 481 U.S. at 745).
[74] *United States v. Fulwiler*, No. 23-30152, 2023 WL 7118748, at *1 (5th Cir. Oct. 27, 2023) (per curiam) (collecting cases).
[75] *Diaz*, 116 F.4th at 471 (citing *Rahimi*, 144 S. Ct. at 1898).

## V. CONCLUSION

Although used loosely at the time of the Founding,[76] the term "felony" has evolved to signify serious crimes with substantial imprisonment terms. Until recently, one's *status* as a felon was enough to disqualify them from firearm possession—what *kind* of felon mattered not. This changed with *Bruen*, when the Supreme Court ruled that punishment by disarmament must proceed by "direct analogy to history."[77] Post-*Bruen*, courts must look carefully to the underlying felony which disqualified the individual from firearm possession. Because not all felonies, as "felony" is understood today, were felonies at the Founding, not all felonies warrant disarmament under § 922(g)(1).

So, while many of Garmon's convictions render him a felon by today's standards, not all would have done so at the Founding. For now, this Court declines to consider whether *all* of Garmon's convictions warrant disarmament. It is enough that at least one of Garmon's previous convictions—robbery—does. Thus, Garmon's conviction and resulting

---

[76] *Kanter*, 919 F.3d at 460 (Barrett, J., dissenting) (citing THE FEDERALIST No. 42, at 228 (J. R. Pole ed., 2005)
[77] Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99, 99 (2023).

disarmament under § 922(g)(1) fit firmly within this Nation's historical tradition and are constitutional under the Second Amendment.

The Motion to Dismiss Indictment[78] is thus **DENIED**.

It is so **ORDERED**.

SIGNED this 31st day of October, 2024.

*[signature]*

DAVID COUNTS
UNITED STATES DISTRICT JUDGE

---

[78] Doc. 39.